IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LIBERTARIAN PARTY OF ILLINOIS, et al., | Case No. 20-cv-2112 |
| Plaintiffs, | Hon. Charles R. Norgle, Sr., Presiding Judge |
| and KYLE KOPITKE, | |
| Intervenor, | |
| v. | |
| J.B. PRITZKER, et al., | Hon. Rebecca R. Pallmeyer, Emergency Judge |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs are the Libertarian Party of Illinois; the Illinois Green Party; and several Illinois registered voters who wish to vote for those parties' candidates in the November 2020 election, to run for state or federal office in the November 2020 election on behalf of those parties or as independents, and/or to gather signatures to ensure that their candidates of choice appear on the ballot for the November 2020 election.[1] On April 2, 2020, Plaintiffs filed this lawsuit against Illinois Governor J.B. Pritzker and others, seeking to enjoin or modify "Illinois' in-person signature collection and witnessing requirements for independent and third-party candidates in Illinois seeking to qualify for the November 3, 2020 election," in light of the "public health emergency

---

[1] The registered-voter Plaintiffs are David F. Black, whom the Illinois Green Party has nominated as its candidate for United States Senate; Sheldon Schafer, who is a Co-Chair of the Illinois Green Party and has full authority to act for and on behalf of it in this lawsuit; Richard Whitney, who is likewise a Co-Chair of the Illinois Green Party and has full authority to act for and on behalf of it in this lawsuit; Bennett W. Morris, who is the Chair of the Libertarian Party of Illinois and has full authority to act for and on behalf of it in this lawsuit, and whom the Libertarian Party of Illinois has nominated as its candidate for the United States House of Representatives, District 5; William Redpath, whom the Libertarian Party of Illinois has nominated as its candidate for the United States House of Representatives, District 6; Marcus Throneburg, who is an independent candidate seeking election to the Illinois State Senate, District 37; and David Gill, who is an independent candidate seeking election to the United States House of Representatives in Illinois' District 18.

caused by the novel coronavirus [COVID-19] and the Governor's emergency orders effectively shutting down the State." (Compl. [2] ¶ 1; *see also* Am. Compl. [17] ¶ 1.) The matter was assigned to the Honorable Charles R. Norgle, but because Plaintiffs have requested emergency relief, it is before this court for this motion only. On April 17, 2020, the court granted Kyle K. Kopitke's motion for leave to intervene.[2] After a round of briefing and several hearings, the court is entering a preliminary injunction order, granting Plaintiffs' motion in part and accepting Defendants' proposed alternative resolution in part.

## BACKGROUND

"Illinois classifies general-election candidates into three groups: those affiliated with an 'established' political party, those affiliated with a 'new' political party, and those running as independents." *Libertarian Party of Illinois v. Scholz*, 872 F.3d 518, 521 (7th Cir. 2017). An "established" political party is one whose candidates have received a certain threshold of votes in recent elections. *See* 10 ILCS 5/10-2. Established political parties face lower requirements for getting their candidates to appear on the ballot—especially when it comes to the collection of voter signatures. (*See, e.g.,* State of Illinois 2020 Candidates Guide, Ex. B to Defs.' Resp. to Emergency Mot., [16-2] at 25–27 (noting new party and independent candidates for state senator require substantially fewer signatures than established party candidates).) To appear on the ballot for statewide office, new party and independent candidates must collect signatures from the lesser of 25,000 voters or 1 percent of the votes cast in the most recent statewide election. 10 ILCS 5/10-2. And to appear on the ballot for a political subdivision within the state, like a legislative district, the number of signatures required is 5 percent of the voters who voted for the last election for that office. *Id.* For example, a new party candidate for the U.S. Senate would need 25,000 signatures, while a Democrat or Republican would need only 5,000 to 10,000. (State

---

[2] Kopitke is a "native of Illinois and a current Michigan resident" who wishes to run as an independent for United States President in the 2020 election. (Emergency Am. Mot. to Intervene [7] ¶ 6.)

2

of Illinois 2020 Candidates Guide [16-2] at 22.) State law regulates how these signatures must be collected, as well. Specifically, all signatures have to be "wet" signatures (*i.e.*, physical signatures as opposed to electronic signatures), signed by a voter in person, and notarized. *See* 10 ILCS 5/10-4.

These signature requirements present an obvious obstacle for candidates like Plaintiffs Libertarian Party of Illinois and Illinois Green Party as well as for independent candidates like Intervenor Kyle Kopitke, but the regulatory scheme has been repeatedly upheld by federal courts. *See Libertarian Party of Illinois v. Rednour*, 108 F.3d 768, 774 (7th Cir. 1997) ("The Supreme Court has long permitted states to impose various restrictions limiting a candidate's access to the ballot."); *Nader v. Keith*, No. 04 C 4913, 2004 WL 1880011, at *6–8 (N.D. Ill. Aug. 23, 2004), *aff'd*, 385 F.3d 729 (7th Cir. 2004) (denying challenge to Illinois' petition and signature requirements). Courts have reasoned that while these laws potentially impose some burden on candidates' speech and association rights, the state has an "important interest of ensuring that a political party that is new in a particular political subdivision demonstrates a modicum of public support before it can place its candidates on an election ballot." *Libertarian Party*, 108 F.3d at 775. And the in-person signature and notarization requirements have been upheld as well because such rules have been determined to serve the "legitimate need" of rooting out fraud. *See Tripp v. Smart*, No. 14-CV-0890-MJR-PMF, 2016 WL 4379876, at *7 (S.D. Ill. Aug. 17, 2016) (noting that Illinois has a history of "roundtabling" and "other types of circulator fraud"), *aff'd sub nom. Tripp v. Scholz*, 872 F.3d 857 (7th Cir. 2017).

However challenging it may be in general to satisfy the statutory signature and notarization requirement, Plaintiffs and Intervenor argue that under current circumstances, those requirements impose a burden that effectively violates their rights. Illinois today confronts a public health emergency resulting from the spread of the novel coronavirus, COVID-19. Beginning in mid-March, the Governor of Illinois, J.B. Pritzker, issued a series of executive orders limiting public gathering and culminating in a shelter-at-home order on March 20, which requires all individuals

3

to stay at home except for persons engaged in certain "essential" activities. (Am. Compl. [17] ¶¶ 48–53.) Most public establishments have been closed, and public events have been cancelled as well. Practically all public gatherings of any size have been banned. (*Id.* ¶ 53 (citing COVID-19 Executive Order No. 8).) The stay-at-home order will remain in place until at least April 30, but, as Plaintiffs note, there is great uncertainty about how long it might remain in place. (*Id.* ¶ 57–58.) The court takes notice that a further extension of many restrictions on personal contacts is all but certain. *See* http://www.chicagotribune.com/coronavirus/ct-coronavirus-illinois-stay-at-home-extension-20200423-cqp6wzjj5ng7rgrfpg64ijgoua-story.html (last visited April 23, 2020).

Despite this disruption and rapid spread of a contagious and dangerous respiratory illness, new party and independent candidates like Plaintiffs and Intervenor are, under current law, still required to obtain thousands of wet signatures and to file their completed petitions by June 22, 2020—when the state *could* still be subject to a stay-at-home order. *See* 10 ILCS 5/10-4. In essence, they must choose between complying with the governor's emergency orders intended to prevent the spread of the coronavirus or engaging in the outreach needed to receive signatures to appear on the ballot. They have therefore brought this challenge to enjoin the state from enforcing certain of these requirements in light of COVID-19.

## **DISCUSSION**

Plaintiffs allege that under the extraordinary circumstances unleashed by the COVID-19 pandemic, the signature requirements at issue violate their First Amendment rights, as well as their rights under the Equal Protection Clause of the Fourteenth Amendment. Although there is no fundamental right to seek elected office, the Supreme Court has recognized that ballot access laws like the ones at issue here "place burdens on two different, although overlapping, kinds of rights—the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively." *Williams v. Rhodes*, 393 U.S. 23, 30 (1968); *see also, e.g.*, *Munro v. Socialist Workers Party*, 479 U.S. 189, 193 (1986) (similar); *Anderson v. Celebrezze*, 460 U.S. 780, 786 (1983) (stating that

4

the "primary concern" with ballot access restrictions is their "tendency . . . 'to limit the field of candidates from which voters might choose'" (quoting *Bullock v. Carter*, 405 U.S. 134, 143 (1972)). "Both of these rights . . . rank among our most precious freedoms." *Rhodes*, 393 U.S. at 30. They are "not absolute," however. *Munro*, 479 U.S. at 193. States have an important interest in regulating elections, including an interest in "avoiding confusion, deception, and even frustration of the democratic process at the general election." *Id.* at 194 (quoting *Jenness v. Fortson*, 403 U.S. 431, 442 (1971)); *see also Navarro v. Neal*, 716 F.3d 425, 431 (7th Cir. 2013) (recognizing that "ballot access laws serve the important, interrelated goals of preventing voter confusion, blocking frivolous candidates from the ballot, and otherwise protecting the integrity of elections"). Thus, as referenced above, it is well-settled that States may require candidates to make "some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot." *Jenness*, 403 U.S. at 442; *see also, e.g.*, *Munro*, 479 U.S. at 193–4; *Libertarian Party*, 108 F.3d at 775.

In determining whether a ballot access restriction survives constitutional scrutiny, courts apply the framework articulated in *Anderson*, 460 U.S. 780, and *Burdick v. Takushi*, 504 U.S. 428 (1992). The *Anderson-Burdick* framework directs courts to "make a practical assessment of the challenged scheme's justifications and effects." *Stone v. Bd. of Election Comm'rs for City of Chicago*, 750 F.3d 678, 681 (7th Cir. 2014). First, a court must "consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate." *Anderson*, 460 U.S. at 789. Then, a court "must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule." *Id.* A court "must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights." *Id.* The Seventh Circuit has stated that, "[p]ractically speaking, much of the action takes place at the first stage of [this] balancing inquiry." *Stone*, 750 F.3d at 681. "If the burden on the plaintiffs' constitutional rights is 'severe,' a state's regulation must be narrowly

5

drawn to advance a compelling state interest." *Id.* (quoting *Burdick*, 504 U.S. at 434). By contrast, "[i]f the burden is merely 'reasonable' and 'nondiscriminatory' . . . the government's legitimate regulatory interests will carry the day." *Stone*, 750 F.3d at 681 (quoting *Burdick*, 504 U.S. at 434); *see also Lee v. Keith*, 463 F.3d 763, 768 (7th Cir. 2006) ("Ballot access restrictions are evaluated under a flexible standard that weighs the 'character and magnitude of the asserted injury to the [protected rights] that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State . . . .'" (internal quotation marks omitted) (quoting *Burdick*, 504 U.S. at 434)).

The Seventh Circuit has "warned . . . against federal judicial micromanagement of state regulation of elections." *Stevo v. Keith*, 546 F.3d 405, 409 (7th Cir. 2008) (citing *Crawford v. Marion Cnty. Election Bd.*, 472 F.3d 949, 954 (7th Cir. 2007)). But it has also made clear that a district court has broad equitable authority to fashion appropriate relief when an election procedure violates the Constitution:

> [T]he district court has the power to order the state to take steps to bring its election procedures into compliance with rights guaranteed by the federal Constitution, even if the order requires the state to disregard provisions of state law that otherwise might ordinarily apply to cause delay or prevent action entirely. . . . To the extent that Illinois law makes compliance with a provision of the federal Constitution difficult or impossible, it is Illinois law that must yield.

*Judge v. Quinn*, 624 F.3d 352, 355–56 (7th Cir. 2010) (quoting *Judge v. Quinn*, 387 F. App'x 629, 630 (7th Cir. 2010)). Defendants emphasize that the Seventh Circuit, on several occasions, has determined that minimum signature requirements for ballot access under the Illinois Election Code are constitutional. *See, e.g.*, *Tripp*, 872 F.3d at 859, 871–72 (law mandating "new" political party candidates for state representative to meet a 5% signature requirement, collect the signatures in a 90-day timeframe, and have each signature notarized, did not violate the First or Fourteenth Amendments); *Nader*, 385 F.3d at 731 (law requiring independent candidate to, among other things, "obtain nominating petitions signed by at least 25,000 qualified voters" and submit the petitions to the state board of elections "at least 134 days before the election" did not violate the First or Fourteenth Amendments); Defs.' Resp. to Emergency Mot. [15] at 2 (citing same).

6

As the court has noted, however, this lawsuit does not challenge the constitutionality of the ballot access restrictions in a vacuum. Rather, Plaintiffs have requested emergency injunctive relief on the ground that the extraordinary circumstances arising from COVID-19, combined with the ballot access restrictions, violate their First and Fourteenth Amendment rights. If the court were to side with Plaintiffs on that score, it would have the power to enjoin the unconstitutional restrictions and order appropriate relief. *See, e.g.*, *Judge*, 624 F.3d at 355–56; *Jones v. McGuffage*, 921 F. Supp. 2d 888, 892, 902 (N.D. Ill. 2013) (enjoining the State of Illinois from requiring "new" party and independent candidates to submit more than 3,444 valid signatures in order to be included on a special congressional election ballot, where the compliance period was only 62 days; there had been no "lead-up time in which to organize a signature drive"; and the plaintiffs faced additional obstacles, including inclement weather); *Esshaki v. Whitmer*, No. 2:20-CV-10831-TGB, 2020 WL 1910154, at *2, *12 (E.D. Mich. Apr. 20, 2020) (recognizing signature-gathering challenges arising from the COVID-19 pandemic and the State of Michigan's stay-at-home directive, ordering that certain candidates "[s]hall be qualified for inclusion on the August 4, 2020 primary election ballot if the candidate submits fifty percent of the number of valid signatures required by" a Michigan election law, and ordering Michigan's Director of Elections to "adopt and promulgate" appropriate "regulations providing for an additional optional procedure that allows the collection and submission of ballot petition signatures in digital form by electronic means such as email").

The combined effect of the restrictions on public gatherings imposed by Illinois' stay-at-home order and the usual in-person signature requirements in the Illinois Election Code is a nearly insurmountable hurdle for new party and independent candidates attempting to have their names placed on the general election ballot. *See* Ill. Exec. Order No. 2020-10 (Mar. 20, 2020); 10 ILCS 5/10-4. The problem is exacerbated by the circumstance by the fact that the "window" for gathering such signatures opened at nearly the same time that Governor Pritzker first imposed restrictions. The court need not devote significant additional attention to the constitutional

7

questions presented because, after a round of briefing and several hearings and in response to the court's direction at oral argument, the parties have proposed an order that grants appropriate relief in these unprecedented circumstances. Notably, from the outset of these proceedings, even Defendants have acknowledged that the ballot access restrictions must be relaxed, in some shape or form, to account for the havoc that COVID-19 has wreaked. (*See* Defs.' Resp. to Emergency Mot. at 2 (recognizing "the need for some accommodations" under the circumstances).) The court is satisfied that the parties' agreed order will ameliorate Plaintiffs' difficulty meeting the statutory signature requirement due to the COVID-19 restrictions—thereby addressing the constitutional questions raised by Plaintiffs' motion (*see* Pls.' Emergency Mot. [2] at 11–12)—while accommodating the State's legitimate interest in ensuring that only parties with a measurable modicum of public support will gain access to the 2020 general election ballot. *See Jenness*, 403 U.S. at 442.

There is little judicial guidance regarding how to measure whether a new party or independent candidate has demonstrated a modicum of public support sufficient to warrant ballot access. Instead of relying on standards such as the reputation or media coverage of individual candidates, *see, e.g., McCarthy v. Briscoe*, 429 U.S. 1317, 1323 (1976) (Powell, J., in chambers), Illinois, like other states, measures support through signature-gathering. Even under normal conditions, the ultimate number of signatures a candidate must gather will vary widely because the signature requirement is, with some exceptions, based on voter turnout in the previous election. *See Jones*, 921 F. Supp. 2d at 899. Suspending entirely the signature requirement without requiring candidates to otherwise demonstrate historical support would, however, extend far beyond these typical variations. *See Munro*, 479 U.S. at 197 (noting that states need not provide automatic ballot access).

The parties' agreed order, permitting ballot access for previously-qualifying new party and independent candidates, and loosening the statutory signature requirements for other new party and independent candidates, establishes a measurable standard that the State can use to

determine which candidates are eligible to be placed on the ballot in the unique context of this election. The court notes that in order to respect social distancing guidelines implemented in response to the COVID-19 pandemic, numerous states have likewise reduced the number of signatures required for a candidate to be placed on the ballot. *See, e.g., Esshaki v. Whitmer*, No. 2:20-CV-10831-TGB, 2020 WL 1910154, at *12 (E.D. Mich. Apr. 20, 2020) (reducing the statutory signature requirement by 50 percent); *Goldstein v. Sec'y of Commonwealth*, No. SJC-12931, 2020 WL 1903931, at *9 (Mass. Apr. 17, 2020) (same); N.Y. Exec. Order No. 202.2 (Mar. 14, 2020) (reducing the statutory signature requirement to 30 percent of normal); H. 681, 2019–2020 Gen. Assemb., Adjourned Sess. (Vt. 2020) (suspending the statutory signature requirement entirely). Reducing the required number of signatures to 10 percent accommodates the fact that Plaintiffs have not been able to rely on their usual signature-gathering methods for the 2020 general election ballot because the window for collecting signatures in Illinois was slated to begin on March 24, 2020, after the stay-at-home order took effect. *Cf. Goldstein*, 2020 WL 1903931, at *9.

Additionally, permitting candidates to submit physical or electronic copies of petitions accommodates the various practical barriers to collecting signatures at this time—due to the closure of most public places, Illinoisans may have limited access to the Internet or a printer, or may even be wary of opening mailed petitions. *See Esshaki*, 2020 WL 1910154, at *5 (explaining that a mail-based signature campaign is expensive and ultimately ineffective). Other states have similarly permitted signature collection and petition submission in both electronic and physical formats. *See, e.g.,* Fla. Emergency R. 1SER20-2 (Apr. 2, 2020); N.J. Exec. Order Nos. 105, 120 (Mar. 19, 2020, Apr. 8, 2020); Utah Exec. Order No. 2020-8 (Mar. 26, 2020). The court recognizes that the state will be burdened by extending the signature-gathering deadline, but finds this hardship outweighed by the significant difficulties that would be experienced by campaigns trying to implement a new signature-gathering process while complying with even the modified statutory requirements in such a short amount of time. In particular, the court notes that even after some

restrictions are lifted, until a vaccine is available, voters are likely to continue practicing social distancing and avoiding any physical hand contact with other persons or objects.

In sum, the parties' agreed order balances the State's legitimate interests in "preventing voter confusion, blocking frivolous candidates from the ballot, and otherwise protecting the integrity of" the upcoming election, *Navarro*, 716 F.3d at 431, while accommodating the significant restrictions on new party and independent candidates' ability to collect signatures in light of the unprecedented limitations on public gatherings required to reduce the spread of COVID-19.

ENTER:

Dated: April 23, 2020

_____
REBECCA R. PALLMEYER
United States District Judge