1

1      IN THE UNITED STATES DISTRICT COURT
       FOR THE NORTHERN DISTRICT OF ILLINOIS
2               EASTERN DIVISION

3   LIBERTARIAN PARTY OF ILLINOIS    )
    et al.,                          )
4                                    )
              Plaintiffs,            )
5                                    )
              v.                     )   No. 20 CV 02112
6                                    )
    GOVERNOR J.B. PRITZKER, et al., )    Chicago, Illinois
7                                    )   May 15, 2020
              Defendants.            )   10:33 a.m.
8

         TRANSCRIPT OF TELEPHONIC PROCEEDINGS
9
       BEFORE THE HONORABLE REBECCA R. PALLMEYER
10

11  APPEARANCES TELEPHONICALLY:

12  For the Plaintiffs:        MR. OLIVER B. HALL
                               Center for Competitive Democracy
13                             P.O. Box 21090
                               Washington, D.C. 20009
14                             (202) 248-9294
                               oliverhall@competitivedemocracy.org
15
                               MR. SCOTT K. SUMMERS
16                             P.O. Box 430
                               Harvard, Illinois 60033
17                             (815) 403-8411
                               scott@scottksummers.com
18
                               MR. MARK R. BROWN
19                             303 East Broad Street
                               Columbus, Ohio 43215
20                             (614) 236-6590
                               mbrown@law.capital.edu
21
    For Plaintiff Kopitke:     LAW OFFICE OF SAMUEL J. CAHNMAN
22                             BY:  MR. SAMUEL J. CAHNMAN
                               915 South Second Street
23                             Springfield, Illinois 62704
                               (217) 691-6207
24                             samcahnman@yahoo.com

25

```
 1    For Defendants:              MS. ERIN WALSH
                                   MR. MICHAEL T. DIERKES
 2                                 MS. SARAH H. NEWMAN
                                   Office of the Illinois
 3                                 Attorney General
                                   100 West Randolph Street
 4                                 Suite 1300
                                   Chicago, Illinois 60601
 5                                 (312) 814-6122
                                   ewalsh@atg.state.il.us
 6                                 mdierkes@atg.state.il.us
                                   snewman@atg.state.il.us
 7
      For Defendant Board of       KASPER & NOTTAGE, P.C.
 8    Elections:                   BY:  MR. MICHAEL J. KASPER
                                   151 North Franklin Street
 9                                 Suite 2500
                                   Chicago, Illinois 60606
10                                 (312) 704-3292
                                   mjkasper60@mac.com
11

12    Court Reporter:             Judith A. Walsh, CSR, RDR, F/CRR
                                  Official Court Reporter
13                                219 South Dearborn Street, Room 2118
                                  Chicago, Illinois 60604
14                                (312) 702-8865
                                  judith_walsh@ilnd.uscourts.gov
15

16

17

18

19

20

21

22

23

24

25
```

1    (Proceedings heard telephonically:)

2    THE CLERK:  The United States District Court for the

3  Northern District of Illinois is now in session.  The

4  Honorable Chief Judge Rebecca R. Pallmeyer presiding.

5    20 CV 2112, Libertarian Party of Illinois versus

6  Pritzker.

7    THE COURT:  Good morning.  This is Judge Pallmeyer.

8  I know that I have a number of people on the line, so I'm

9  going to ask that you introduce yourselves in just a moment

10  and also remind you that when you do talk that you need to

11  always state your name because we are making a record, and

12  it's difficult for the court reporter to determine one person

13  from another.

14    So we'll begin by, I'm going to begin by asking, why

15  don't we ask the moving party, the State defendants, to

16  introduce themselves first.

17    MR. KASPER:  Michael Kasper, K-a-s-p-e-r, on behalf

18  of the defendant Board of Elections.

19    THE COURT:  Good morning, Mr. Kasper.

20    And other defense counsel?

21    MS. NEWMAN:  Good morning, your Honor.  Assistant

22  Attorney General Sarah Newman on behalf of Governor Pritzker.

23    THE COURT:  Good morning.

24    MS. WALSH:  Good morning, your Honor.  Erin Walsh,

25  Assistant Attorney General, also on behalf of Governor

1  Pritzker.

2          MR. DIERKES:  Good morning, your Honor.  Michael

3  Dierkes, D-i-e-r-k-e-s, also for the governor.

4          THE COURT:  Dierkes, D-i-e-r-k-e-s.  All right.

5  Thank you.

6          Any other -- anyone else for the defendant?

7          All right.  And then I know that we have plaintiffs'

8  counsel and intervenors on the line.  Why don't I ask you to

9  introduce yourselves beginning with plaintiffs' counsel, and

10  then we'll ask for the intervenors.

11          MR. SUMMERS:  Good morning, your Honor.

12          MR. HALL:  Good morning, your Honor.

13          MR. SUMMERS:  This is Scott Summers, S-u-m-m-e-r-s,

14  for the plaintiffs.

15          THE COURT:  Okay.

16          MR. HALL:  Good morning, Judge Pallmeyer.  Oliver

17  Hall for the plaintiffs.

18          THE COURT:  Mr. Hall, good morning.

19          And who else for plaintiffs?

20          MR. BROWN:  Good morning, your Honor.  Mark Brown,

21  your Honor, also for the plaintiffs.

22          THE COURT:  All right.  And then for the intervenor?

23          MR. CAHNMAN:  Your Honor, good morning.  This is Sam

24  Cahnman, C-a-h-n-m-a-n, for the intervenor.

25          THE COURT:  Okay.  Anyone else on the line?

1        All right.  Let me tell you that I've reviewed the

2   motion and the memorandum, and I have reviewed the response

3   that I received from the defendant -- the plaintiffs and

4   intervenor.

5        First, just a procedural point.  I know that the

6   motion for reconsideration was filed on May 8th.  And a few

7   days later, my assistant asked me to -- said she received a

8   call wanting to know when it would be noticed for hearing.

9   First of all, it's normally counsel that notices things for

10  hearing but, of course, we're in a very different situation

11  right now.

12       The other thing I think you should know is that I've

13  been monitoring the emergency docket together with the Clerk

14  of Court, and when matters are filed as emergencies, we see

15  those, and that's how this case came to me in the first place.

16  The case is actually assigned to Judge Norgle of our court.

17  And I'm not sure how frequently he's monitoring his own case

18  civil docket, but I certainly was not monitoring it.  So I was

19  not even aware of the motion for reconsideration immediately

20  when it was filed, and that's one of the reasons that there

21  was a delay on my end.

22       I know one of the arguments has been made by

23  plaintiffs' counsel is that the motion itself is tardy in the

24  sense that it was filed a couple of weeks after the Court's

25  preliminary injunction order actually entered.

1      I understand that the request that's being made here

2  only addresses two of the elements in the Court's order.  One

3  is the filing deadline extension.  I had extended the filing

4  deadline to August 7th.  And defendants are arguing that

5  that's just unworkable and ask that it be moved back to July

6  6th.

7      And then with respect to the signature requirement,

8  the defendants are arguing that 10 percent is too close to de

9  minimus and, in fact, a 25 percent number would be a better

10  measure of the amount of support that a particular candidate

11  has.

12      In opposition to the motion, the plaintiffs have

13  argued that there's been some, at least some reliance on the

14  Court's order in that there's been at least a bit of press

15  coverage and some indication that people who are interested in

16  getting on the ballot would have relied to some degree on the

17  order that the Court has entered.  How much reliance there is,

18  I'm not sure I know apart from the fact that there's been a

19  little bit of publicity that might lead someone into believing

20  they had a certain amount of time left and now they have --

21  they might have less were I to grant the motion.

22      The defendants have also relied heavily on the Sixth

23  Circuit's opinion in the *Esshaki* case which did draw one

24  dissent.  The *Esshaki* opinion effectively says that a district

25  court doesn't really have authority to set terms such as I've

1    done and, in fact, the majority said that the most that the

2    Court could do would be to strike down the current standards

3    and direct that the State officials themselves come up with a

4    more workable plan.

5          My sense -- apart from the fact that it's technically

6    an unpublished decision and doesn't state the law of this

7    circuit, my sense is that, as appealing as the *Esshaki*

8    majority approach is to the Court, I would always much rather

9    the relevant officials come up with a resolution.

10         So appealing as that is, my concern about that is the

11   uncertainty of it and the fact that for both sides in this

12   case and the intervenor, a resolution sooner than later has

13   tremendous value.  To leave the question open and have

14   everyone uncertain about what's supposed to happen and when, I

15   think, is perhaps an even worse result for state officials

16   than one that was imposed by the Court.

17         But with respect to the two issues that we have, that

18   is, the filing deadline and the signature requirement, I guess

19   my sense is that the defendants have made what I think is a

20   reasonable case for reviewing the issue of the filing

21   deadline.  There are real difficulties that are imposed by the

22   publication requirements and the printing requirements that

23   are established by state law if the extension is going to be

24   as late as the one that I had imposed, and particularly in

25   light of the fact that there needs to be some time for

1   challenges to some of those signatures.  I'm not sure how

2   frequent or difficult it is that those challenges would need

3   to be resolved.

4          With respect to the request that instead of a 10

5   percent requirement, we move that to 25 percent, it seems to

6   me that either number is somewhat arbitrary.  And I don't know

7   how much of a difference it makes.  What I do know is that

8   we're dealing with continued grave difficulty in terms of

9   person-to-person contact in the state of Illinois.  Public

10  health officials -- and I realize that there's dissent and

11  disagreement on the part of at least some people in the

12  population, but my view is, we live by the rule of law.

13         And what the governor has said until it's overturned

14  by some judge is the law and needs to be adhered to in any

15  ruling I make that would require or expect or anticipate or

16  even assume that there's going to be a violation of the

17  governor's direction would, I think, be a grave mistake.  I

18  just won't do that.  So I do need to be sensitive to the fact

19  that the plaintiffs are in a very difficult position with

20  respect to gathering signatures.

21         Now, that having been said, some of that has been --

22  much of that has been very significantly ameliorated, it seems

23  to me, by a portion of the Court's order that is not under

24  challenge, and that is the electronic signature requirement.

25         So I guess I need to know, given that change, why a

1   move back from August 7th to a date in July would be

2   completely unacceptable to the plaintiffs. I guess I need to

3   know that.

4           MR. HALL: Your Honor, this is Oliver Hall.

5           THE COURT: Yes, Mr. Hall.

6           MR. HALL: Thank you. As we've discussed in prior

7   hearings, one of the main difficulties is that while

8   electronic signature gathering is certainly preferable during

9   a pandemic, it is a brand new procedure. It's not one that

10   the plaintiffs had any opportunity to prepare to implement,

11   much less to notify their potential supporters that they would

12   be reaching out online effectively by email. It's a

13   completely untested procedure.

14           Even if it works in optimal conditions under these

15   circumstances, the candidates for U.S. House still face very

16   high numbers. They have to collect over 1,000 signatures in

17   many, if not all, districts and they have to do it all by

18   email. That's going to involve 1,000 different emails or more

19   each with a file attachment that is going to be potentially

20   very large. So the logistical difficulties here are

21   considerable.

22           And from our own clients' perspective, although

23   they're very appreciative of the relief that has been granted,

24   they are not necessarily optimistic that they will be able to

25   comply with the signature requirements given the new procedure

1     that they have to follow and their -- it's just unknowable

2     whether this is going to work in any kind of significant

3     numbers.

4           That said, they have relied on the Court's order, and

5     they have diligently attempted to comply with it from the day

6     that it was entered.  That includes, the Libertarian Party has

7     begun -- I'm not sure if it's complete yet, but they have

8     begun to work on an online portal where they can gather

9     electronic signatures that way.

10          So they really have taken substantial measures to try

11    to comply with the order, but it's not as though this is a de

12    minimus requirement.  1,000 signatures by email is going to be

13    a very heavy lift.  And we're not at all confident that many

14    or even some candidates will be able to do it.

15          MR. CAHNMAN:  Your Honor, this is Sam Cahnman for the

16    intervenor.

17          And this, while the intervenor very much appreciates

18    the relief of the electronic signatures, it is not easy, it's

19    not a piece of cake to get electronic signatures.  And as

20    Mr. Winger asserted in his -- or pointed out in his affidavit,

21    even the signature requirement as set forth in this order is

22    not the lowest in the country.  It's still -- before, we were

23    the -- we were basically the highest.  With the new signature

24    requirements, this puts Illinois at about the midrange of

25    signature requirements among the 50 states.

1          And I have encountered candidates seeking to get

2    these electronic signatures, and they have told me of the

3    great difficulty.  It's not like you can go door to door or go

4    to a shopping center or a place where a lot of people gather

5    and get one signature after another.  You have to send out a

6    mass email.  And then a lot of people don't read their emails

7    or they don't -- they see the email and they just don't click

8    on it.  You can -- and so then you have to follow up with a

9    phone call.  It's a very tedious process.

10          And I doubt that very many candidates would be able

11    to achieve the number of signatures required here if the

12    deadline was moved back from August 7th.  And Mr. Hall talked

13    about 1,000 for Congress.  Actually, some of the districts are

14    1,000 but the highest district, the 6th Congressional district

15    under your order, candidates still have to acquire almost

16    1,599 signatures.  That's not a small piece of change.

17          So I don't think, while the electronic signatures is

18    the only way to get signatures in the current circumstances,

19    it's not an easy way to do it.

20          MR. HALL:  And if I may, your Honor.  It's Oliver

21    Hall.

22          Just to make one more point, it's not as though the

23    plaintiffs have an email list of all potential signers in

24    their jurisdictions.  So apart from all the other

25    difficulties, assuming they did have email addresses, is the

1    difficulty of reaching potential supporters in the first place

2    by email.  They may simply not be able to reach voters who

3    would otherwise be willing to sign their nomination petitions.

4         THE COURT:  I guess both concerns relate to both

5    prongs of the relief that's being requested now:  The deadline

6    and the percentage issue.  But I think they're more salient

7    with respect to the percentage issue.  Either it's going to

8    work or it's not going to work.

9         It's not easy, nothing about this is easy for either

10   side in this dispute.  I just want to make that clear.  You

11   know --

12        UNIDENTIFIED SPEAKER:  Judge, this is --

13        THE COURT:  -- I think the plaintiffs have a very,

14   very difficult burden and I think the defendants do as well

15   because of the difficulty of getting these materials printed

16   and also reviewing challenges and doing that in a responsible

17   way.  That's their responsibility under the law.

18        And anything further from the defendant?  Let me tell

19   you what I'm inclined to do here is to move the -- move the

20   deadline back maybe by a couple of weeks but probably leave

21   the 10 percent requirement in place because I do think there

22   are real challenges in getting signatures electronically in

23   spite of the fact that on the one hand, it seems easy.  On the

24   other, I think the plaintiffs are correct that it's not like

25   going to the mall and as people walk by asking them to do

1   something that's quite easy for them to do and that they may

2   very well be willing to do versus getting an electronic

3   message that they may not have any inclination to open and

4   look at.  So I think there are real difficulties on both

5   sides.

6           But I do want to hear from the defendant.  I've heard

7   from the plaintiff.

8           MR. CAHNMAN:  Judge, may I?  This is Sam Cahnman.  If

9   I may make one other brief point.

10          THE COURT:  Sure.

11          MR. CAHNMAN:  Under Illinois law, the deadline for

12  submitting petitions for referendums is August 3rd.  And that,

13  the same challenge for us that is available to challenge

14  candidates' petitions is in the law for challenging referendum

15  petitions.  So this August 3rd date -- or August 7th date is

16  only, what, four days more than August 3rd.

17          So these problems that the defendants are claiming

18  due to August 7th are just not there.  It's already, the law

19  already provides for filing petitions for referendums almost

20  as late as August 7th.

21          THE COURT:  All right.  For the defendant?

22          MR. KASPER:  Yes.  This is Michael Kasper on behalf

23  of the Board.  And, your Honor, thank you for entertaining the

24  motion.

25          Number one, relating to Mr. Cahnman's position about

1    the August 3rd deadline, the August 3rd deadline applies only

2    to advisory referenda at the statewide level. And there

3    hasn't been one of those in over 20 years, as far as I'm

4    aware.

5            And number two, there's never really any litigation

6    about that because they're simply advisory referenda whereas

7    there's almost always litigation challenging candidate

8    eligibility to appear on the ballot. And that's what's

9    causing the problem.

10           The motion -- the reason why we took a little bit of

11    time to get the motion on file is because the elections in

12    Illinois are actually run by the local county clerks. There's

13    108 different election jurisdictions. So we had to publish --

14    work through them, and that's when we really found out that

15    the current plan was untenable. In fact, the deadline used to

16    be that August 3rd deadline for these types of candidates, and

17    the legislature moved it back ten years ago as I pointed out

18    in my papers.

19           And we don't -- as the Board has taken the position

20    all along that you have to strike a balance between the

21    interest of the plaintiffs to get candidates' names on the

22    ballot, but there's also the interest of the voters who are

23    going to get incomplete or inaccurate ballots mailed to them

24    if all of the steps that the Board has to take to finalize the

25    ballot are not completed before they start mailing the ballot.

1       So that's what the Board is trying to balance here.

2   That's why they filed the motion because even moving the

3   deadline up a few weeks will help enormously in finalizing

4   that so that these military and other mail-out ballots will be

5   accurate and so that voters are actually voting for candidates

6   whose names are actually going to be on the ballot at the end

7   of the day.

8       And so that's the purpose of the motion.  And while

9   we -- the number-one issue for the Board, as I've been

10  directed to seek, is some relief on that filing deadline.  I

11  think that the combination of the extended filing and the

12  greatly reduced signature requirement will lead to an influx

13  of candidates and, therefore, an influx of litigation and,

14  therefore, an influx of delay in getting these ballots

15  finalized.

16      As I'm sure you're aware, these ballot challenges are

17  appealable all the way to the Illinois Supreme Court and, of

18  course, that takes time.  And so that's what they're trying to

19  balance here.  And so that was the purpose of the motion.  So

20  any relief on those two issues, the Board would be

21  appreciative of.

22      MR. CAHNMAN:  Judge, if I may, in response,

23  Mr. Kasper is not correct about advisory referendum petitions

24  are the only petitions that have an August 3rd deadline.  In

25  fact, statewide advisory petition referendum, petitions are

1   due six months, not on August 3rd, but six months before the

2   election.

3          The August 3rd date is for both advisory and binding

4   referendums that can be filed pursuant to Article 7, Sections

5   4(c) and 11 of the Illinois Constitution.  And they can be

6   filed in all the election jurisdictions on August 3rd.  So

7   the --

8          THE COURT:  I'm sorry to interrupt but -- I'm sorry

9   to interrupt.  We want to make sure that you tell us your

10  name.

11         MR. CAHNMAN:  Oh, this is Sam Cahnman.  I apologize.

12         THE COURT:  That's all right.  Go ahead.

13         MR. CAHNMAN:  So in any event, so there are many,

14  many different types of petitions that can be filed under

15  Illinois law, under the Illinois election code on August 3rd

16  in all the election jurisdictions of the state.  And

17  objections can be filed to those petitions.

18         And so the objections to the candidate petitions

19  filed on August 3rd -- or August 7th, just a few days later,

20  would be no different than what already has already been going

21  on in Illinois this year and in all prior general elections.

22         So we would urge the Court not to move it back, the

23  deadline back, two weeks.  Perhaps moving it back to the

24  August 3rd deadline would possibly -- would be acceptable, but

25  certainly two weeks, I think, would put a lot of people off

1    the ballot who otherwise would have made it on the ballot

2    including my client.

3          MR. HALL:  Your Honor, this is Oliver Hall, if I may

4    make a point.

5          THE COURT:  Sure.

6          MR. HALL:  To the extent that the defendants are

7    concerned that the -- that sufficient time needs to be allowed

8    for objections to candidate petitions, I think it's also

9    relevant to remember that the signature requirement reduction

10   itself will ameliorate much of the difficulty of adjudicating

11   those challenges.

12         So whereas a candidate for U.S. House might have to

13   submit more than 10,000 signatures in many districts, that

14   signature requirement has been reduced and, therefore, the

15   number of signatures to be verified and the difficulty and

16   burden of doing that will be correspondingly reduced.

17         THE COURT:  I'm aware of that.  I think the reduction

18   in the number of signatures required does, at least to some

19   extent, limit the number of challenges that there would be.  I

20   guess one thing I'm uncertain about based on what I just heard

21   is, is it the case or is it not the case that the ballot is

22   different in each -- wouldn't the ballot be different in each

23   of these districts?

24         MR. CAHNMAN:  That's correct.  Every election

25   jurisdiction -- Sam Cahnman for the intervenor.

1          Every election jurisdiction has a different ballot.

2    And within those election districts, there are many different

3    ballots as well based on where a person lives.

4          THE COURT:  But that distinguishes the situation from

5    the referendum situation.  We're talking about a referendum

6    that would be the same on every ballot throughout the state of

7    Illinois, correct?  Am I right about that?

8          MR. CAHNMAN:  Well, the same, the objectors -- the

9    objections and the challenges would be the same.  I mean,

10   different candidates appear on the ballot in different

11   election jurisdictions as well.  You have -- what, we have 118

12   House districts, 59 Senate districts and --

13         THE COURT:  But I'm looking at the burden on the

14   State of printing these ballots and getting them out to people

15   remembering too that, you know, for reasons that we can all

16   immediately understand, there's going to be a lot more mail

17   voting, I think, this year than there has been in previous

18   years.

19         MR. CAHNMAN:  Yes, but it -- this is Sam Cahnman.

20   But it's the local election officials that print the ballots

21   and get them out, not the State.

22         MR. KASPER:  Your Honor, this is Michael Kasper for

23   the Board.

24         That's correct, the local election officials mail out

25   the ballots, but they can't do that until they're notified by

1    the defendant State Board of Elections what the final form of

2    the statewide ballot is going to be.  That's -- and so the

3    problem is that if the mail -- the deadline to mail the ballot

4    comes before the State Board has finalized it, voters are

5    going to receive potentially inaccurate ballots.  And that's

6    what we're trying to prevent.  That's why -- that's why the

7    late filing deadline is different.

8         And I won't bore you with the details about the

9    difference between local referenda which are filed on August

10   3rd for a smaller jurisdiction like a county or a village or

11   something like that versus one that's filed for the whole

12   state.

13        As Mr. Cahnman pointed out, the deadline for filing a

14   statewide referendum is six months before the election, which

15   has long since passed.  And the reason for that is because it

16   takes time to resolve all the steps that are necessary to

17   finalize.

18        THE COURT:  I also think there's at least some

19   difference between the constitutional significance of names on

20   a ballot versus the state referendum process.  I don't think

21   there's any clear right answer here.  I don't think that

22   there's any clear way to address all of the concerns that have

23   been generated by this public health emergency but I think

24   really impinge on both sides significantly.  I just don't

25   think there's any way to resolve this in a way that's truly

1    fair to both sides.

2         I will note that the plaintiff believes -- or

3    plaintiffs believe that the requirements of gathering

4    signatures are going to be truly onerous, and the defendants

5    believe that it will be easy enough that there will be too

6    many names.  Those things can't both be true.

7         My inclination in the end is to do pretty much what I

8    suggested at the outset.  I'm going to move the deadline back

9    just by a couple of weeks to, say, we'll say July 20th and

10   then leave the 10 percent requirement as it is recognizing,

11   ladies and gentlemen, I'm no Solomon here.  We don't always

12   get it exactly right.

13        I think getting an answer is better than waiting for

14   the perfect answer, and that's why I'm going to enter an order

15   today that grants some of the relief that's been requested but

16   not all of it.  I want to --

17        MR. CAHNMAN:  Thank you, your Honor.

18        THE COURT:  -- thank you for your prompt and vigorous

19   advocacy.  These are hard issues, and they're important

20   issues.  I'm honored to be in this role.  And I wish I could

21   do more for both sides.  Thank you.

22        THE CLERK:  Court is in recess.

23     (Proceedings recessed at 11:00 a.m.)

24

25

1                C E R T I F I C A T E

2         I, Judith A. Walsh, do hereby certify that the

3  foregoing is a complete, true, and accurate transcript of the

4  telephonic proceedings had in the above-entitled case before

5  the Honorable REBECCA R. PALLMEYER, one of the judges of said

6  court, at Chicago, Illinois, on May 15, 2020.

7

8  */s/ Judith A. Walsh, CSR, RDR, F/CRR*_____      May 15, 2020

9  Official Court Reporter

10  United States District Court

11  Northern District of Illinois

12  Eastern Division